Filed 6/12/14  In re Gemma K. CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re Gemma K., a Person Coming Under the Juvenile Court Law. | |
| SAN FRANCISCO COUNTY HUMAN SERVICES AGENCY,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.C.,<br><br>        Defendant and Appellant. | A140505<br><br>(San Francisco City and County Super. Ct. No. JD11-3076) |

R.C.  (appellant), mother of three-year-old Gemma K., appeals from the juvenile court's order, pursuant to Welfare and Institutions Code section 366.26,[1] terminating her parental rights and ordering adoption as the permanent plan.  Appellant contends the juvenile court improperly found that she had failed to establish the applicability of the beneficial parent-child relationship exception to adoption.  We shall affirm the juvenile court's order.

**FACTUAL AND PROCEDURAL BACKGROUND**

On March 11, 2011, the San Francisco County Human Services Agency (Agency) filed a petition alleging that seven-month-old Gemma came under section 300,

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

1

subdivision (b), as a result of appellant's inability to provide her with adequate care, supervision and protection.[2]  Gemma was detained.  The detention report filed by the Agency described the circumstances leading to detention.  Appellant and Gemma's father had a relationship characterized by domestic violence.  On March 4, 2011, appellant and Gemma's father began to argue about appellant's level of intoxication.  Appellant pushed the father on the bed and began to punch him in the face with closed fists.  The father reacted by scratching appellant's face and neck.  The father called the police, appellant was arrested, and an emergency protective order issued.  After appellant's incarceration, the Agency met with Gemma's maternal grandmother to develop a safety plan for the baby's care, while child protective services investigated the referral.

Gemma was born premature and had severe medical problems, including chronic lung disease.  She required daily nebulizer and oxygen treatment.  Because of her severe medical and respiratory problems, she was not able to come into contact with sick children or adults.  She required supervised visitation where she would not come into contact with numerous individuals.

Before the detention hearing, the social worker met with the maternal grandmother to create a safety plan for her care for Gemma and for her older brother (who was already living with the maternal grandmother) while CPS continued its investigation.  A team decision-making meeting was held March 9, 2011, and appellant agreed to meet with the domestic violence specialist from Positive Directions.  The social worker referred appellant to Homeless Prenatal Program (HPP) for a substance abuse assessment and to the National Council on Alcoholism and Other Drug Addictions-Bay Area for drug testing.  The social worker also referred the parents and Gemma to Foster Care Mental Health for counseling, medication evaluation, and therapeutic visits.  At the continued detention hearing on March 17, 2011, Gemma was detained in foster care.

---

[2]  Most of the facts regarding events occurring before the section 366.26 hearing are taken from our prior nonpublished opinion in this matter, filed on May 9, 2013, in which we denied appellant's petition for extraordinary writ, pursuant to California Rules of Court, rule 8.452 (rule 8.452).  (*R.C. v. Superior Court* (A137894).)

The disposition report, filed on April 21, 2011, related that issues around violence and substance abuse had caused the removal of Gemma from appellant. Upon meeting the social worker, appellant presented as "very depressed." She had a history of mental illness and had been hospitalized for depression. Appellant did not admit to any substance abuse. However, she was testing and attending services. She was also in a domestic violence class at the Riley Center. Although the violence between appellant and the father was severe, appellant refused to discuss it at all. The Agency had made referrals for individual therapy and a psychological evaluation and was waiting for appellant to be assigned. Appellant was receiving therapeutic visits with Gemma twice a week at A Better Way. The Agency also had obtained and delivered a Fast Pass to appellant and, when she stated she lost the pass, she was given tokens.

The child remained medically fragile. She required oxygen at night, along with a medication for lung distress. She used Pulmicort for her nebulizer twice daily. She appeared alert and had a good appetite. She was receiving services from Golden Gate Regional Center for gross motor skill delays.

On June 20, 2011, at the conclusion of the combined jurisdiction/disposition hearing, the court declared a dependency for Gemma and found true the following: "B1—The mother has a substance abuse problem for which she requires assessment and treatment and which impedes her ability to safely parent the child. [¶] . . . [¶] B5—The mother has mental health issues, including psychiatric hospitalizations, for which she requires assessment and treatment and which impede her ability to safely parent the child. [¶] . . . [¶] B9—The child is at risk of physical harm in that the parents have a relationship in which they have engaged in domestic violence with the child present. Further, both the mother and father have sustained injuries during these incidents."

Other allegations regarding the father alone were also sustained. The court struck several other allegations, including Count B6, which had alleged appellant had developmental delays requiring assessment and treatment and which impeded her ability to safely parent Gemma.

3

The court found the Agency had made "reasonable efforts" to prevent or eliminate the removal of Gemma from the home. Services recommended by the Agency and ordered by the court for appellant included: That she undergo "individual counseling/Therapy which addresses Domestic Violence, Trauma, Effective Communication, Self-Esteem and the Effects of Violence on Children"; that she "remain under the care of a qualified mental health professional and comply with the mental health professional's recommendations for psychotherapy and/or prescribed medication"; that she "maintain a clean and safe home for the child[]"; and that she "refrain from substance abuse and participate in services recommended from the substance abuse assessment." The court ordered the father, but not appellant, to "actively participate in a 52-week DV [domestic violence] program."

In the six-month review report, filed on January 30, 2012, the Agency reported that appellant was engaged in services, appeared to be maturing, and was working towards completing her requirements to reunify with Gemma. The Agency reported it intended to move visitation to appellant's home in an effort to advance her progress toward reunification. The social worker reported that appellant's home appeared neat and clean and that appellant had worked hard to clean her home in preparation for Gemma's return. Appellant had been working closely and consistently with A Better Way to improve her parenting skills and had visited consistently, demonstrating improved parenting skills.

All appellant's drug tests had been positive for marijuana. Appellant had a cannabis card and tested within the limits according to California law. Appellant stated she was making efforts to reduce her use and her test levels were initially high, but were down recently.

Appellant had been referred to Jane Christmas for psychological testing on March 30, 2011. Appellant reported she had completed the testing over the summer, but when the worker contacted Christmas to obtain a copy of the report in October, she learned that appellant had started the testing but never finished it. The worker arranged a follow up appointment with Christmas.

4

Appellant was being seen by Lindsey Ewick, a therapist at Bayview Mental Health for therapeutic services. However Ewick had not responded to the worker's November request for information. Ewick stated she needed to confirm she had a release of information from appellant. As of January 5, 2012, she had not returned the worker's phone calls. There had been no reported instances of domestic violence during the reporting period.

The report expressed the concerns of Gemma's doctor that she not be exposed to second hand smoke, given her chronic lung disease. Appellant reported she did not smoke in the house. According to Gemma's physical therapist, she needed more tummy time to start crawling and her fine motor skills were also delayed.

At the March 1, 2012 hearing on the six-month status review, the court found a substantial probability Gemma would be returned to the physical custody of the parent within six months. It found the Agency had made "reasonable efforts" to aid the parent to overcome the problems leading to the initial removal and continued custody of Gemma. It also found appellant's progress had been "substantial." The court ordered continued services to be provided to appellant and set the 12-month hearing for April 26, 2012.

The court also found the father had made no progress and terminated the supportive services the Agency had been providing.

The status review report for the 12-month hearing, filed on April 9, 2012, recommended an additional six months of services be provided appellant. The report related that in December 2011 and January 2012, appellant was "5150'd due to depression[;] however she was discharged right away." At the time of the report, appellant was on medication. She continued to see Ewick for therapeutic services. Ewick told the worker on April 4, 2012, that she could not provide an update on therapy without first reviewing the consent forms. Ewick did not thereafter provide a progress report.

Appellant completed her psychological evaluation with Christmas and "the evaluation indicated the presence of significant mental health problems, for which

5

[appellant] needs intensive support to address." Appellant had a dual diagnosis of depression, not otherwise specified; alcohol abuse, and a personality disorder characterized by paranoid and narcissistic traits; and limited cognitive capabilities. Insofar as appellant's ability to care for Gemma was concerned, Christmas recommended that appellant attend regular alcohol treatment, ongoing anger management, parenting classes, and intensive individual therapy. Appellant continued to use and test positive for marijuana. She denied using alcohol or marijuana at the time the report was prepared; however, Christmas found that appellant minimized her alcohol abuse and diagnosed her with alcohol abuse. Appellant was receiving twice-a-week visits with Gemma, in her home, supervised by A Better Way.

At the 12-month review hearing held April 26, 2012, the court found appellant's progress "substantial," ordered an additional six months of reunification services, and set the 18-month review hearing for September 27, 2012.

In addition to the information set forth above, the September 12, 2012 report, prepared for the 18-month review, related that the early interventionist with the Golden Gate Regional Services expressed concern regarding appellant's smoking habits and reported her home smelled of smoke. Appellant admitted she continued to use marijuana, despite expiration of her card. She again claimed to be in the process of quitting. She claimed she had discontinued her alcohol use and her test results showed no record of alcohol abuse. She was continuing individual therapy with Ewick, but the therapy had been reduced to once-a-month sessions. Ewick told the social worker that appellant was no longer benefitting from the weekly sessions and did not have much to talk about. Ewick had worked with appellant for more than a year. The therapist stated it was a joint decision to move to monthly visits and reported that she did not believe it would be therapeutically appropriate to expand visits to more than once a month. Ewick would not elaborate on appellant's therapeutic services, stating that the only release appellant had authorized was to give the worker a record of appellant's attendance. She did inform the worker that appellant was diagnosed with major depressive disorder recurrent in partial

6

remission. She reported appellant was continuing to work on managing her depression and that she was taking her medication regularly.

The Agency was concerned about appellant's relationship with the father, since it appeared appellant was not engaging in protective measures to address the hostile and violent nature of their relationship. In May 2012, the therapeutic visitation worker told the worker that the maternal grandmother had reported she thought that the father might have been at the home during a visit. A service tech responsible for transportation had reported that on one occasion appellant would not allow her in the house during drop off and the service tech thought this behavior was odd. Appellant denied this had happened and denied that the father had ever been present during a visit. The social worker met with appellant to discuss this information and made it clear to appellant that the father could not be around when Gemma is visiting and that his presence created a safety threat for Gemma. Appellant stated that she and the father continued to see each other, but are not in a relationship and that she had no desire to get back together. The worker discussed the police service calls to appellant's residence (five between January and May 2012) and offered a referral to appellant to undergo a domestic violence intake with the Agency's domestic violence specialist, Christine Leon, to address this continued issue. Appellant asked if she and the father could just sign something saying they would stay away from each other.

On June 1, 2012, appellant reported the father had tried again to come into the house and she had refused. The worker suggested she call Leon and discuss strategies for dealing with the relationship. The worker also gave appellant the number of the Riley Center Crisis Line in the event the father attempted to come to the house again. In a conference call with appellant and Leon, they discussed her ongoing relationship and strategies for being proactive and dealing with the relationship. Leon stated that appellant had previously participated in eight weeks of domestic violence classes and had transitioned to individual therapy to address issues related to domestic violence existing in her relationship with the father. Leon stated that she and Appellant had contacted appellant's counsel to obtain a restraining order against the father. On June 18, appellant

admitted that the father might still have a key to the home and that she would put in a request to have the locks changed. A day later, appellant stated she was backing off on requesting the restraining order because she did not want to cause any more drama in her life. She said she had put in the request to change the locks. On July 23, 2012, appellant stated in response to the social worker's inquiry that she did not think it was necessary to change the locks. The worker discussed with appellant the importance of this safety measure for Gemma. Appellant was told the most recent call on the police log was July 13, 2012, and appellant denied the police came out that day. The worker informed appellant that she would no longer be able to have unsupervised visits due to the Agency's concerns about her interaction with the father. She was encouraged to follow through with the various suggestions to change the locks, get a restraining order, follow through with her therapy and with domestic violence services. The Agency referred appellant to another domestic violence program, Casa De Las Madres, for a domestic violence support group. Appellant reported that she had completed intake there and would begin a domestic violence group the week of August 27, 2012. She reported she had had her locks changed.

Two-year-old Gemma was reported to be in the 12- to 18-month range in all developmental domains. She had a significant expressive language delay and used approximately 10 words. She had failed all developmental milestones for two-year-olds, except her ability to imitate adults, which she passed. She was not walking yet, but had learned to pull herself up over the last couple of months and was very mobile. Her breathing condition was getting better, although there were ongoing concerns regarding appellant's cigarette and marijuana smoking and the effects on Gemma's chronic lung disease. Although there was no direct evidence that appellant was smoking in the home, the social worker and another service provider each reported the home had a stale smokiness present during their visits.

The Agency recommended termination of reunification services to appellant and the setting of a section 366.26 selection and implementation hearing to implement a permanent plan.

In August 2012, a dispute over visitation arose when the Agency, which in July 2012 had exercised its court-authorized discretion to move to unsupervised visits between appellant and Gemma, required that visits again be supervised. The Agency required supervision upon discovering appellant had continued her volatile relationship with the father, inviting him to her home, resulting in conflict between the pair and police intervention.

A hearing on the visitation dispute was set for August 15, 2012. The attorney for Gemma filed a declaration in support of an ex parte hearing on the request for a formal order for supervised visits only, stating: "Mother misrepresented her continued involvement with Father to both the Agency and to the Agency's domestic violence specialist. San Francisco Police Department records of calls for service to appellant's home indicate that contrary to appellant's representations, the police have been called to Mother's home on *eight* occasions since January 2012 to separate Mother and Father. By her own declaration, Mother states that she has not sought police assistance but rather that Father has sought police assistance following Mother's visit with Father and dispute or conflict arising during the interaction." (Italics added.) Appellant admitted that the father came to her home unannounced and police records reflected calls for service at all different times of the day and on different days of the week. Appellant admitted the father had keys to her home and continued to have those keys. Police officers reported they had regular contact with appellant and the father and, on at least one occasion in the previous two months, the officers smelled alcohol on both parents' breath while confronting them about a conflict. Appellant had consistently been admonished that her continued relationship with the father would jeopardize reunification.

On August 10, 2012, after the Agency discovered this information and moved to reinstate supervised visits, appellant's attorney requested a restraining order against the father. Appellant's declaration stated the father had a "habit of coming by my apartment uninvited and unannounced." She admitted she sometimes let him in, but stated he often refused to leave. She stated that the father had made the calls to the police, falsely stating that she was being violent with him. She stated that he was trying to jeopardize her

9

efforts to reunify with Gemma and that he had told her so directly. Appellant maintained there was no current physical violence between the pair. She also maintained that the father had not been present during any of her unsupervised visits with Gemma. She admitted she had allowed him into her home and that she had not been "entirely truthful with my social worker about my contact with him." She also admitted the police repeatedly had advised her not to let the father into her home. On August 13, 2012, the court denied the temporary restraining order against the father. On August 15, the court confirmed that appellant's visits were to be supervised by the maternal great-grandmother. The Agency was given discretion to move to unsupervised visitation with 24 hours notice to Gemma's counsel.

On September 18, 2012, appellant filed a section 388 request to change court order, seeking to return to unsupervised visits with Gemma, and describing the steps she had taken to follow up with regard to the relationship with the father, including changing her locks, not allowing the father into the home and engaging in domestic violence services. The hearing on the section 388 petition was scheduled and later continued to be combined with the 18-month review hearing that was continued to November 16, 2012. Three days before the review hearing, appellant moved to continue it pursuant to section 352, arguing she was doing very well, that she had not shown any record of alcohol use and her marijuana levels had dropped to zero recently. She had attempted to obtain a restraining order against the father, had attended eight weeks of domestic violence classes and transitioned to individual therapy to address issues related to domestic violence. She maintained that the therapy had been reduced to monthly, despite her need for intensive therapy. Relying on *In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, appellant's counsel requested a continuance in order to "clarify the relationship between the parents and allow the appellant . . . time to engage in intensive therapy." The court approved a continuance to January 7, 2013.

On January 3, 2013, Gemma's counsel sought an order that appellant's visits be supervised by the Agency, rather than the maternal grandmother, and that visits be reduced from 11 hours per week (two 5.5 hour visits) to two 3-hour visits per week.

10

Counsel did so after receiving documentary proof on January 2, 2013, that appellant's recent urinalysis tests established that she continued to use alcohol and that she had seven positive results over the preceding two months, one of which indicated use within eight hours of testing. Appellant admitted she had resumed drinking because of "stress." Six of the seven positive tests indicated appellant drank at or near the time of her visits with Gemma. The police made two service calls to appellant's home in November (after appellant had filed the section 388 petition to change the order to unsupervised visits and overnight visits) to address conflicts between appellant and the father. Contrary to appellant's August 2012 statements that she was finished with her violent and unhealthy relationship with the father, she admitted they had been attempting to reconcile. Further, appellant's use of alcohol was particularly troubling, as in the past she had been involved in violent altercations while under the influence of alcohol. Counsel for Gemma argued that supervision by Gemma's elderly great-grandmother was insufficient to assure Appellant had not consumed alcohol before a visit and that the maternal great-grandmother was under no duty to report to the court on such matters. On January 4, 2013, the court granted the request to have appellant's visits supervised by the Agency, but denied the request for a reduction in duration of the visits. The 18-month review hearing was again continued.

An addendum report filed in advance of the 18-month review hearing set for February 8, 2013, confirmed many details set forth in Gemma's counsel's request to change appellant's supervised visits. Appellant admitted she had been drinking, that she had tested positive for alcohol use on seven occasions since October, that she had invited the father to her home to "work on" the relationship, and that police were called on two occasions in November in response to altercations between the couple at appellant's home. Appellant informed the worker she was now staying away from the father, that she had changed her phone number and had put in a request to the housing authority to move her residence. She said she had begun participating in weekly domestic violence classes with a local domestic violence support group and with the Riley Center. Appellant reported that she had recently resumed weekly therapy with Ewick, after

11

having once monthly therapy for a period of about five months. The therapist informed the worker that appellant was working on domestic violence issues, parenting topics, and managing her depression. The therapist reported appellant had demonstrated progress in that she left the relationship with the father, stayed on her medication and had not had a major depressive episode in some time.

Appellant had been referred to HPP for substance abuse at the outset of the dependency. According to the initial assessment, she had been drinking alcohol for 11 years, and had periods of heavy drinking for the last two years. Appellant did not start case management with HPP until 2012, and attended regularly for a brief period until July 2012, at which point she began canceling appointments and did not return. Appellant was provided with relapse prevention counseling during the monthly meetings and was encouraged to continue going to AA meetings on a regular basis. Appellant only participated in AA for a two-month period and was not attending at the date of the report.

The 18-month review hearing was held on February 8, 2013, some 23 months after Gemma's initial detention. Social Worker Candace Seagrove was the only witness. The status review report and the addendum were admitted into evidence. Seagrove confirmed the Agency's recommendation to terminate reunification services, despite the Agency's extensive work with appellant to resolve the safety issues giving rise to the dependency. The primary concern was appellant's continued involvement in the volatile relationship with the father. Notwithstanding more than 18 months of services and continued admonitions that the volatile relationship was putting her reunification at risk, appellant admitted she had invited the father to her home and was trying to work on the relationship. The worker testified there had been numerous 911 calls involving disputes between the pair, but conceded she was unaware of any arrests for domestic violence since the March 2011 incident that precipitated the dependency. Seagrove testified that appellant reported the two would argue and the argument would escalate to either her calling the police to get the father to leave or he would end up calling the police because she was asking him to leave.

With respect to the requirement that appellant participate in intensive individual therapy services, Seagrove testified that appellant's therapist was in the best position to implement the recommendations set forth in the psychological evaluation. Appellant was referred for weekly individual therapy with Ewick, in which appellant had participated for a substantial amount of time. However, for a period of approximately five months the weekly therapy transitioned to once monthly sessions because, according to the therapist, appellant was not benefitting from the weekly sessions and did not have much to discuss during their therapy sessions. The decision to reduce the frequency of sessions was a joint decision by appellant and the therapist. Seagrove testified that one of the issues addressed in appellant's therapy was domestic violence.

Seagrove disputed Ewick's view that appellant had made progress in the relationship with the father. The Agency worked with appellant over the course of the dependency to address the domestic violence and social workers had repeatedly explained to appellant that Gemma could not be exposed to that relationship due to the history of violence and the nature of the violence. They had believed appellant was "on track" to unsupervised overnight visits when everything halted in August due to discovery of appellant's reengagement with the father and her admission that she had not been truthful with the Agency about that relationship. Appellant had been receiving domestic violence services from the Riley Center since August 2012, as well as through the Agency's domestic violence specialist. Upon referral by the Agency, appellant had also participated in an eight-week domestic violence group at the beginning of the case.

Seagrove also testified that in addition to the domestic violence issues, the Agency had ongoing concerns about appellant's substance abuse issues, particularly her continuous use of alcohol and her smoking habits. Seagrove related that appellant had recently begun testing positive for alcohol beginning in October 2012, and as recently as January 2013, one month before the 18-month review hearing. Appellant never completed a program or committed to AA, even after numerous referrals issued to HPP to assist her in overcoming her substance abuse. Asked why the Agency did not provide alternative services, the social worker explained that appellant was not testing positive for

13

alcohol before her relapse in October 2012, and there was no indication that she needed a more rigid program. Seagrove testified appellant tested positive for marijuana on at least one occasion since September, although her most recent tests had been negative. The worker described the Agency's concern about appellant's use of alcohol and marijuana to cope with stress and about the impact on appellant's cognitive abilities when she is under the influence of these substances, insofar as her ability to care for this special needs child was concerned.

The Agency was also concerned about appellant's smoking cigarettes and her minimizing the importance of her smoking in light of the information provided by Gemma's doctors and the Agency regarding the detrimental effects her smoking had on Gemma, whose lung function was already seriously compromised and the referral to HPP to receive support to stop smoking. A pulmonary specialist was monitoring Gemma and in light of her condition, a smoke-free home was essential "so as not to trigger any kind of asthma conditions relating to the chronic lung disease." Appellant indicated she wanted to stop smoking only a few weeks before the 18-month review hearing. The social worker again referred appellant to HPP to assist her with smoking cessation. The social worker opined that in light of Gemma's multiple medical and developmental needs and appointments, it was extremely important that her caretaker be drug free, very organized and very present and aware.

At the end of the hearing, the court terminated reunification services to appellant. It found that she had made some effort to comply with reunification requirements, but that she had not reached a point where she could be entrusted to provide the necessary protective measures Gemma required. The court also rejected appellant's argument that she had not received sufficient therapeutic services, finding "the therapist herself had assessed that mom wasn't benefiting from the therapy sessions, and that they jointly decided that they would go to monthly sessions and that mom didn't have much to talk about and things were just not moving." The court found by clear and convincing evidence that appellant did not and was not able to participate fully in the court-ordered treatment plan, that the Agency had made reasonable efforts to provide or offer services

designed to overcome the obstacles leading to the dependency, and that the Agency complied with the case plan by making reasonable efforts to return Gemma to a safe home. The court further found that return of Gemma to the parents would create a substantial risk of detriment to the safety, protection, emotional or physical well being of Gemma. The court set a section 366.26 hearing.

On May 8, 2013, we denied appellant's petition for extraordinary writ, filed pursuant to rule 8.452, in which she sought review of the juvenile court's findings and orders terminating her reunification services and setting a section 366.26 hearing.

In the June 11, 2013 section 366.26 report, the Agency related that Gemma, who was now nearly three years old, had been diagnosed with chronic lung disease, though her asthmatic condition continued to improve. She had made impressive developmental strides, but continued to demonstrate deficits in all developmental areas.

Gemma was "social and friendly" and had bonded closely with her foster/adoptive parents, with whom she had lived since August 2012. The foster/adoptive parents had expressed "a willingness for an open adoption and for Gemma to continue to know and have a relationship with her biological family, per their parental discretion." They wanted to focus on establishing a relationship with appellant and to then let appellant decide which relatives she would like to include in ongoing contact with Gemma. The social worker had submitted a referral to the Consortium for Children to assist in mediating future visitation. The social worker believed that adoption with these prospective parents was in Gemma's best interest. "Gemma receives devoted care and attention to her many needs in this home. Gemma's foster dads have demonstrated a commitment to permanency for Gemma and have been exceptional in managing her multiple care needs. . . . Gemma has progressed markedly well in this home in all her areas of development and continues to thrive in this home."

Since the last court date in February, appellant had participated in supervised visitation with Gemma every other week. Appellant and other relatives, such as the great-grandmother and Gemma's brother, were "appropriate and caring" during visits.

15

The Agency recommended termination of parental rights and approval of adoption as the permanent plan.

At the November 6, 2013 section 366.26 hearing, Ronda Johnson, a child welfare supervisor for the Agency, testified that the permanent plan for Gemma continued to be adoption with her current caretakers, with whom she had lived for 15 months and to whom she looked for provision of her day-to-day needs. The prospective adoptive parents had completed an adoptive home study, were committed to adopting Gemma, and were able to meet her special needs.

Arlette Smith, a social worker in the Agency's adoptions unit, testified that appellant participated in supervised visitation once every other week for three hours. She had not observed any of the visits, but the supervisor of the visits had informed her that appellant attended the visits regularly and that they were "going fine" and were "unremarkable." Nothing detrimental to Gemma was taking place at the visits, although the supervisor was encouraging appellant to be more physically active with Gemma during visits.

Smith testified that Gemma had special needs, including a chronic lung condition and asthma, endocrinological and neurological issues, as well as developmental delays that required physical and occupational therapy. The prospective adoptive parents had been able to meet Gemma's special needs and Smith believed they would continue to do so in the future. Gemma had progressed developmentally while living with the prospective adoptive parents.

Appellant testified that since she had begun visiting with Gemma in 2011, she had missed only two or three visits. Appellant's mother, grandmother, and son also attended some visits. Appellant had previously visited Gemma three times a week, but visits were now once every other week. During the visits, appellant would make Gemma breakfast and lunch, play and read with her, and fix her hair. Appellant believed that she had a beneficial relationship with Gemma that should continue because she took care of Gemma and did not harm her, and they love each other.

16

At the conclusion of the hearing, the juvenile court found that Gemma's best interests would be served by adoption by her current caretakers, with whom she could "have stability and permanency through a loving home." The court also found that the benefit of a continued relationship with appellant did not outweigh the benefits that adoption with her prospective adoptive parents would provide her.[3] The court therefore terminated appellant's parental rights.[4]

## DISCUSSION

### *Applicability of the Beneficial Parent-Child Exception to Adoption*

"Once reunification services are ordered terminated, the focus shifts to the needs of dependent children for permanency and stability. [Citation.]" (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1320.) "At a hearing under section 366.26, the court must select and implement a permanent plan for a dependent child. Where there is no probability of reunification with a parent, adoption is the preferred permanent plan. [Citation.]" (*In re K.P.* (2012) 203 Cal.App.4th 614, 620.) When the court finds that the child is likely to be adopted if parental rights are terminated, it must select adoption as the permanent plan unless it finds by clear and convincing evidence, pursuant to one of the statutorily-specified exceptions, "compelling reason[s] for determining that termination would be detrimental to the child." (§ 366.26, subd. (c)(1)(B).) The parent has the burden of proving that termination of parental rights would be detrimental to the child under any of these exceptions. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.)

---

[3] The court observed that the prospective adoptive parents had indicated that they were open to an open adoption with appellant and perhaps other family members. But the court also made clear that the prospective adoptive parents' potential willingness for appellant to have contact with Gemma played no part in its finding Gemma adoptable and the beneficial parent-child relationship exception inapplicable.

The court did state that visitation would "be arranged between the adoptive parents and [appellant]."

[4] The court also terminated the parental rights of Gemma's father, who is not a party to this appeal.

At issue here is the beneficial-parent child relationship exception, which applies if the juvenile court finds, by clear and convincing evidence, that "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).)

Appellate courts have differed on the correct standard of review for determining the applicability of a statutory exception to termination of parental rights. (Compare, e.g. *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 [applying substantial evidence standard]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 [applying abuse of discretion standard]; *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622 [applying substantial evidence standard of review to whether beneficial parent-child relationship exists and applying abuse of discretion to standard to whether that relationship provides a compelling reason to apply exception]; accord, *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.) The "practical differences" among these various standards of review "are not significant" (*In re Jasmine D.*, at p. 1351), and our conclusion ordinarily would be the same under any one of them. Because, in this case, both parties apply the standard of review articulated in *In re Bailey J.* and *In re K.P.*, we shall do the same.

Here, appellant contends the juvenile court wrongly concluded that the benefit of a continued relationship with appellant did not outweigh the stability and permanency that adoption with her prospective adoptive parents would afford Gemma  Respondent, while acknowledging that appellant regularly visited with Gemma and that Gemma apparently enjoyed the visits, argues that appellant did not satisfy the additional requirements of the beneficial parent-child relationship exception to adoption.

In *In re C.F.*, *supra*, 193 Cal.App.4th at page 555, the appellate court explained that it had "interpreted the phrase 'benefit from continuing the relationship' in section 366.26, subdivision (c)(1)(B)(i) to refer to a 'parent-child' relationship that 'promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing

18

the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citation.]

"A parent must show more than frequent and loving contact or pleasant visits. [Citation.] 'Interaction between natural parent and child will always confer some incidental benefit to the child. . . .' [Citation.] The parent must show he or she occupies a parental role in the child's life, resulting in a significant, positive emotional attachment between child and parent. [Citations.] Further, to establish the section 366.2, subdivision (c)(1)(B)(i) exception the parent must show the child would suffer detriment if his or her relationship with the parent were terminated. [Citation.]" (*In re C.F.*, *supra*, 193 Cal.App.4th at p. 555, quoting *In re Autumn H.*, *supra*, 27 Cal.App.4th at p. 575, fn. omitted.)

"Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350.) "Application of this exception is decided on [a] case-by-case basis and a court takes into account such factors as the minor's age, the portion of the minor's life spent in the parent's custody, whether interaction between parent and child is positive or negative, and the child's particular needs." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 471.)

In the present case, the evidence shows that appellant regularly visited with Gemma during the years of the dependency. It also shows that appellant cared about Gemma and that they had a positive relationship. The record further reflects, however, that appellant was not able to resolve the issues leading to dependency or to meet the special needs of three-year-old Gemma, who has remained out of appellant's custody for more than half of her young life. (See *In re Scott B.*, *supra*, 188 Cal.App.4th at p. 471.) In short, substantial evidence supports the juvenile court's implied finding that a beneficial parent-child relationship does not exist between appellant and Gemma. (See *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622; see also *In re C.F.*, *supra*, 193

19

Cal.App.4th, at p. 555 [parent must show she "occupies a parental role in the child's life, resulting in a significant, positive emotional attachment between child and parent"].)

Moreover, even assuming appellant did demonstrate that a beneficial parent-child relationship existed between her and Gemma, we find no abuse of discretion in the juvenile court's determination that appellant has not shown that termination of parental rights would be detrimental to Gemma, i.e., that the benefit of a continued relationship with appellant outweighs the well-being Gemma would gain from a permanent adoptive placement. (See *In re C.F.*, *supra*, 193 Cal.App.4th, at p. 555.)

The evidence shows that, for Gemma, it is her prospective adoptive parents who provide her with the ongoing parental guidance, nurturance, and stability that she needs. As the social worker related in the section 366.26 report, Gemma had "bonded closely with her foster/adoptive parents, looking to them as her 'secure base.'" The social worker further related that Gemma was receiving "devoted care and attention to her many needs" and that the prospective adoptive parents had "demonstrated a commitment to permanency for Gemma and have been exceptional in managing her multiple care needs. . . . Gemma has progressed markedly well in this home in all her areas of development and continues to thrive in this home." In addition, multiple therapists and service providers who made home visits had "observed collectively that Gemma's foster dads . . . are nurturing, committed, and involved in every aspect of helping Gemma to learn and grow . . . ."

In addition, at the section 366.26 hearing, Ronda Johnson, social work supervisor, testified that it was Gemma's current caretakers—with whom she had lived for 15 months at the time of the section 366.26 hearing and who were committed to adopting her—to whom she turned for provision of her day-to-day needs. Arlette Smith, Agency adoptions social worker also testified that the prospective adoptive parents were able to meet Gemma's special medical and developmental needs and that Gemma had progressed developmentally while in their care.

In light of all of this evidence, the juvenile court plainly did not abuse its discretion when it concluded that Gemma's relationship with appellant was not so

important to her well-being as to outweigh the well-being she will gain in a secure, permanent adoptive home with her current caretakers. (See *In re K.P.*, *supra*, 203 Cal.App.4th at pp. 621-622; see also *In re C.F.*, *supra*, 193 Cal.App.4th, at p. 555; compare *In re Brandon C.* (1999) 71 Cal.App.4th 1530, 1537-1538 [mother had been permitted only limited visitation, but evidence of benefit of continued contact between her and children was sufficient to support juvenile court's decision to order guardianship].)[5]

In sum, this is not the sort of "extraordinary case" in which the "preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement." (*In re Jasmine D.*, *supra*, 78 Cal.App.4th at p. 1350; see § 366.26, subd. (c)(1)(B)(i).)

---

[5] To support her argument that guardianship was the proper permanent plan in this case, appellant cites a treatise and several law review articles, as well as cases from other jurisdictions, regarding the value to children of maintaining relationships with their birth families. Appellant makes a worthwhile general point but, as a practical matter, as respondent observes, "Had the Legislature intended to allow dependency courts the discretion to choose among various permanent plans, despite the child's adoptability and the inapplicability of any exceptions, it certainly had the means to create such legislation. It did not."

Here, because the juvenile court reasonably found that Gemma is adoptable and that none of the statutory exceptions to adoption apply, it properly terminated appellant's parental rights. We also observe, however, that there is a real possibility that Gemma and appellant will continue to have some postadoption contact, given that the prospective adoptive parents appear to appreciate the likely benefit to Gemma of continuing contact with her birth mother.

## DISPOSITION

The juvenile court's order terminating appellant's parental rights with respect to Gemma K. is affirmed.

_____
Kline, P.J.

We concur:

_____
Richman, J.

_____
Brick, J.*

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.